UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| MARK P. RODGERS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 08-CV-3161 |
| | ) |
| JESSE WHITE, Secretary of State, | ) |
|    Office of the Secretary of State | ) |
|    for the State of Illinois, | ) |
|    *in his official capacity*, | ) |
| DONNA MULCAHY FITTS, and | ) |
| STEPHAN J. ROTH, | ) |
| | ) |
| Defendants. | ) |

## **OPINION**

This case is before the court for ruling on the Motion for Summary Judgment (#33) filed by Defendants Jesse White, Donna Mulcahy Fitts, and Stephen J. Roth. This court has carefully reviewed Defendants' Memorandum of Law and supporting exhibits (#34), and the Memorandum of Law in response (#38, #39) and exhibits (#40-42) filed by Plaintiff, Mark P. Rodgers. Following this careful and thorough review, Defendants' Motion for Summary Judgment is GRANTED.

## JURISDICTION

Jurisdiction of this court is premised on 28 U.S.C. § 1331, federal question jurisdiction. Plaintiff has filed the instant action pursuant to 42 U.S.C. §§ 1981, 1983, and § 2000(e) (Title VII).

## FACTS

Plaintiff, an African-American, began working for the Illinois Secretary of State in 1985 as a member of the Yard Maintenance Crew (YMC) in the Department of Physical Services. Plaintiff was the only African-American employee in the Yard Maintenance Crew during the entire relevant period. On October 1, 1989, Plaintiff was promoted to Yard Maintenance Supervisor. Between 2003 and 2006, Plaintiff reported to David Rusciolelli, who was the Lead Yard Maintenance Supervisor. On August 8, 2006, Plaintiff was suspended from employment pending discharge, as a result of a series of alleged violations of Secretary of State policy. Plaintiff filed an appeal of the charges, which was denied on September 6, 2006.

On September 7, 2006, Plaintiff was discharged from employment by Defendant Roth, who was the Director of Personnel for the Office of the Secretary of State. Roth relied on a report from the Office of the Inspector General (OIG) following an investigation into Plaintiff's behavior, and a request and recommendation from Defendant Fitts. Defendant Fitts was the Director of the Department of Physical Services and thus Plaintiff's ultimate supervisor. Both the recommendation and the OIG report included charges pertaining to two incidents: first, an incident involving a lawn aerator belonging to the Secretary of State that had been borrowed by an employee; and second, an incident involving the recording and tracking of compensatory time accrued by YMC employees. In addition to the two incidents that officially contributed to Plaintiff's discharge, there was another conflict between Plaintiff and Fitts that did not officially contribute to the discharge.

The same day Plaintiff was discharged, he filed a charge of discrimination with the Illinois Department of Human Rights and EEOC, alleging that Fitts and Roth harassed him, and that Roth discharged him because of his race. Plaintiff also grieved his discharge. An arbitration

proceeding was held, pursuant to the collective bargaining agreement (CBA). The arbitrator found that the evidence presented was insufficient to clearly and convincingly prove that Plaintiff was guilty on six of the seven charges. After the arbitration, Plaintiff's discharge was rescinded, and Plaintiff's employment was reinstated, with compensation for lost wages. As of the filing of this action, Plaintiff was employed as a storekeeper for the warehouse of the Support Division for the Department of Physical Services. On July 29, 2008, Plaintiff filed suit alleging race discrimination in violation of 42 U.S.C. 42 U.S.C. §§ 1981, 1983, and § 2000(e) (Title VII).

A. Lawn aerator incident

In 2005, Jon Greeley, a member of the YMC, took a state-owned lawn aerator to aerate the private property of a friend. Using State property for personal purposes was a violation of State rules. Plaintiff told another employee, Jarrod Perce, to retrieve the aerator. The parties dispute whether Plaintiff knew that the aerator was located at a private residence, or whether he intended for Perce to simply retrieve the aerator from its proper storage location.

After an investigation, the OIG issued a report on October 24, 2005, concluding that Plaintiff had supervisory authority and had known and allowed employees to use state property for personal reasons. In response, the Department of Physical Services requested that Plaintiff be placed on suspension for 18 days as a result of this incident. However, due to a change in the Director's position from Cecil Turner to Fitts, the suspension was delayed. It is not clear from the record and briefs whether Plaintiff was actually suspended. Greely was discharged for taking the aerator and because he did not have a valid driver's license, which was required to properly perform his job. Perce was given a three-day suspension for retrieving the aerator while on State

time, although Plaintiff testified that Perce told him that the suspension was never actually imposed.

In the subsequent 2006 investigation, the OIG charged Plaintiff, in regard to this incident, with knowingly permitting the employees under his purview to misuse State equipment for personal reasons; failing to act promptly and properly upon discovering that the equipment had been borrowed; and making false statements to OIG personnel during the investigation. At the arbitration following Plaintiff's discharge, the arbitrator concluded that (1) not only did Plaintiff lack the degree of supervisory authority requisite to permit other employees to borrow State equipment, but also that (2) the evidence did not clearly and convincingly support the charges that Plaintiff had either (a) given permission, in general, to borrow State equipment, or (b) known that the aerator had been borrowed.

B. Timekeeping incident

In 2002 or 2003, the former Chief of Staff for the Secretary of State, Tom Benigno, prohibited employees from working overtime unless specifically authorized to do so. Because the work performed by the YMC was, by its nature, highly unpredictable, such as shoveling snow and clearing walkways in the winter, it would be impossible to completely avoid overtime work. Cecil Turner, who was, at the time, the Director of the Physical Services Department, reached an understanding with the employees and the union that overtime work would be recorded as compensation time on an independent timesheet, affording employees paid time off in lieu of overtime pay. Plaintiff and Bob Deffenbaugh reported directly to David Rusciolelli. Both Plaintiff and Deffenbaugh were responsible for (1) directing the work flow of the other

4

YMC employees; (2) ensuring that the other employees performed their duties; (3) manually recording overtime work on the independent timesheet; and (4) granting permission to use accumulated overtime hours. Both Plaintiff and Deffenbaugh performed the same supervisory functions under the direct supervision of Rusciolelli.

After Fitts replaced Turner in November 2005, Fitts investigated the timekeeping practices of the YMC. Fitts refused to allow the alternate timekeeping method to proceed under her governance. The union representative, Bob Ward, expressed the concern whether, even if Fitts eliminated the alternate timekeeping method on a going-forward basis, employees would be appropriately compensated for previously-worked time. Fitts and Ward could not come to an acceptable agreement regarding the previously-worked time, and consequently, Ward filed a grievance against Roth and Fitts. Fitts demanded the original records, which both Plaintiff and Ward did not wish to surrender in order to retain them for evidentiary and paper-trail purposes. Plaintiff then made copies for himself and Ward while being supervised and observed by Ward, and gave the originals to Fitts. At several instances afterward, Fitts indicated that her set of originals was not complete, so at each occasion, Ward made a copy of his copy and gave them to Fitts to supplement her set. After receiving copies from Ward's set, Fitts became satisfied with the integrity of the records. An independent audit conducted by the Department of Personnel found that Plaintiff's calculations and timekeeping had been correct.

On March 1, 2006, after the amount of overtime owed to each employee had been calculated, Plaintiff was told to attend a meeting where he could review the calculations. In addition, Plaintiff was told to inform all the employees who reported to him that they were also required to attend that meeting to review the amount of overtime they had been assigned. The

parties dispute whether Plaintiff did in fact tell the other employees that they were required to attend the meeting. Notably, Fitts scheduled the meeting for a time after the end of the work shift. Fitts had no authority, pursuant to the CBA, to order employees to perform any overtime work without an indication that they would be paid for that overtime. Earlier, Fitts had given a directive that there would be no more overtime without her prior approval and two-day's notice. Fitts did not indicate that she had approved overtime pay for the meeting that she scheduled, and thus, neither Plaintiff nor any other employee were authorized, or for that matter, required to attend. Plaintiff and several other employees did not attend the meeting for this reason. Furthermore, the parties dispute whether *Plaintiff* even had the authority to require other employees to attend the meeting.

After Plaintiff did not attend the meeting, Fitts called him and authorized overtime for him to attend a subsequent meeting. Plaintiff attended that meeting. After the meeting, and because the audit by the Department of Personnel concluded that YMC employees had worked overtime and were therefore entitled to compensation, the Department of Physical Services was required to pay overtime compensation in the amount noted on Plaintiff's forms.

As a result of engaging in unapproved timekeeping, Rusciolelli was demoted from Lead Yard Maintenance Supervisor to a non-supervisory position, with a commensurate reduction in pay of more than $800 per month. Despite the fact that Deffenbaugh engaged in identical timekeeping duties and reported to Rusciolelli like Plaintiff did, Fitts did not challenge or request Deffenbaugh's records.

C. Flag-raising incident

Since 1986, Plaintiff had been responsible for raising and lowering the flag on the top of the Capitol building. This responsibility was not part of the CBA, nor was it in the job description of any employee represented by the union. Historically, one of the YMC employees had volunteered to raise and lower the flag in return for extra compensation because completing the task required passing though areas covered in asbestos and was dangerous during inclement weather. Plaintiff had volunteered to do so and had received extra compensation. Fitts testified that she wanted to ensure that there was a fair opportunity for all employees to receive the extra compensation. The parties dispute whether any other YMC employee actually wanted to perform the duty. Fitts then made the responsibility available to all the YMC employees and asked each employee to sign a form indicating whether they were interested in performing the duty. On the form, Plaintiff indicated he was no longer interested in performing the duty. It is not clear, from the record and briefs, whether any other YMC employees volunteered to perform the task.

On April 1, 2006, the flag needed to be lowered. Fitts told Rusciolelli to tell Plaintiff to lower the flag. Plaintiff refused to lower the flag, as he had declined to perform the duty. Fitts threatened Plaintiff with discipline for engaging in insubordination if he refused to comply. Both Rusciolelli and the union informed Fitts that she could not order Plaintiff to do so, pursuant to the CBA because it was not one of Plaintiff's job responsibilities, and he would not receive extra compensation. Plaintiff was not directly disciplined as a result of refusing to lower the flag.

PROCEDURAL POSTURE

Plaintiff filed the Complaint (#1) in this case on July 28, 2008 against Defendants White,

Fitts, and Roth, in their official and individual capacities, alleging violations of 42 U.S.C. §§ 1981, 1983, and 2000e (Title VII), in the Central District of Illinois, Springfield Division. The case was assigned to United States District Judge Jeanne Scott. On October 6, 2008, Defendants filed a Motion to Dismiss regarding certain claims (#10). On November 24, 2008, Plaintiff filed his response (#15). On December 3, 2008, Judge Scott granted the motion to dismiss (#16). First, that court dismissed the §§ 1981 and 1983 claims against Defendants in their official capacities, pursuant to Hearne v. Board of Educ. of City of Chicago, 185 F.3d 770, 776 (7th Cir. 1999). Second, because Plaintiff alleged only official capacity claims against Defendant White, that court dismissed in entirety the §§ 1981 and 1983 claims against Defendant White. Finally, because a supervisor, in his individual capacity, does not fall within Title VII's definition of employer, pursuant to Sattar v. Motorola, Inc., 138 F.3d 1164, 1168 (7th Cir. 1998), that court dismissed the Title VII claims against Defendants Fitts and Roth. Following the Order of December 3, 2008, three claims remained: (a) the individual capacity claims against Defendants Fitts and Roth, pursuant to §§ 1981 and 1983; and (b) the official capacity claim against Defendant White, pursuant to Title VII.

On July 29, 2010, this case was reassigned to this court for further proceedings. Discovery closed on August 10, 2010. On September 1, 2010, Defendants filed a Motion for Summary Judgment, with a memorandum of law and exhibits (#33, #34). On September 28, 2010, Plaintiff filed his Response, with a memorandum of law and exhibits (#37-42). On October 12, 2010, Defendants filed their Reply (#43).

## ANALYSIS

# I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004) (citations omitted). Specifically, the nonmoving party must point to enough evidence to show the existence of each element of its case on which it will bear the burden at trial. Celotex Corp., 477 U.S. at 322-23; see also Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004). A plaintiff must do more than "simply show that there is some metaphysical doubt as to the material facts." Faas v. Sears, Roebuck & Co., 532 F.3d 633, 640 (7th Cir. 2008), quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

# II. OVERLAP BETWEEN § 1981, § 1983, AND TITLE VII CLAIMS

The same *prima facie* elements for intentional racial discrimination apply to claims brought under § 1981 and Title VII. Hobbs v. City of Chicago, 573 F.3d 454, 460 n.1 (7th Cir. 2009); Humphries v. CBOCS West, Inc., 474 F.3d 387, 403 (7th Cir. 2007); see also Freeman v. Chicago Park Dist., 189 F.3d 613, 618 (7th Cir. 1999). Furthermore, the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection claims.[1] Benders v. Bellows & Bellows, 515 F.3d 757, 768 n.7 (7th Cir. 2008); Helland v. South Bend Cmty. Sch. Corp., 93 F.3d 327, 329 (7th Cir. 1996). Therefore, this opinion proceeds by analyzing Plaintiff's § 1981, § 1983, and Title VII claims under the same general framework.

### III. RACE DISCRIMINATION CLAIMS

In a race discrimination case, a plaintiff must demonstrate not only that he suffered a materially adverse employment action, Rhodes v. Ill. Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004), but more importantly, that race was some kind of motivating factor in bringing about the adverse employment action. Winsley v. Cook Cnty., 563 F.3d 598, 605 (7th Cir. 2009) (holding that a race discrimination plaintiff must establish a link between the plaintiff's race and her treatment by the employer). See generally Troupe v. May Dept. Stores Co., 20 F.3d 734, 736-37 (7th Cir. 1994). For the purposes of the instant case, "[a]n adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." Rhodes, 359 F.3d at 504 (7th Cir. 2004). A

---

[1] Plaintiff has not made clear, and therefore, this court, like Defendants, is not certain what claims are being made pursuant to § 1983.

plaintiff may prove that race was a factor in the adverse employment action using either a direct method or an indirect method. Rogers v. City of Chicago, 320 F.3d 748, 753-754 (7th Cir. 2003); Troupe, 20 F.3d at 736. Here, it is clear that Plaintiff suffered a materially adverse employment action, as his employment was terminated.[2]

A. Direct method

1. Direct evidence

Plaintiff argues that the evidence he provided proves intentional race discrimination by the direct method. Under the direct method, a plaintiff demonstrates that his employer had discriminatory intent. Such discriminatory intent may be proved via direct evidence or via circumstantial evidence. Direct evidence under the direct method consists of a statement by the employer, which, if believed by the trier of fact, demonstrates that the employer had discriminatory intent, without having to rely on an inference or presumption. Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003). Direct evidence is an outright "admission by the decision-maker that his actions were based upon the prohibited animus." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000). It should go without saying that in today's work environment, expressions of discriminatory intent, regardless of the employer's true intent, are rarely encountered. Hoffman v. Caterpillar, Inc., 256 F.3d 568, 576 (7th Cir. 2001). Here, Plaintiff has not presented any direct evidence of discriminatory intent.

---

[2]Although Plaintiff's discharge was rescinded and his employment reinstated, with compensation for lost wages, Plaintiff still has a live claim. 42 U.S.C. § 1981a(b)(3). See, e.g., Goodwin v. Bd. of Trs. of the Univ. of Ill., 442 F.3d 611, 616 (7th Cir. 2006); Ezell v. Potter, 400 F.3d 1041, 1043 (7th Cir. 2005).

2. Circumstantial, or indirect, evidence

Because direct evidence is so uncommon, a plaintiff may also demonstrate discriminatory intent via circumstantial evidence. Circumstantial evidence allows the trier of fact "to infer intentional discrimination by the decisionmaker." Rogers, 320 F.3d at 753. There are three kinds of circumstantial evidence under the direct method:

> The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment received systematically better treatment. Third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief.

Rudin v. Lincoln Land Cmty. Coll., 420 F.3d 712, 720-21 (7th Cir. 2005), quoting Troupe v. May Dept. Stores Co., 20 F.3d 734, 736 (7th Cir. 1994) (internal citations and edit marks omitted).

Circumstantial evidence need not be sufficiently convincing to produce the equivalent of an admission of guilt by the defendant; instead, all that is necessary to defeat a motion for summary judgment is that the bits and pieces of evidence together create "a convincing mosaic of discrimination against the plaintiff." Troupe, 20.F3d at 737. However, circumstantial evidence must point directly to a discriminatory reason for the employer's action. Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003). Plaintiff asserts, in his Memorandum of Law in Opposition to Summary Judgment (#38), that there is sufficient circumstantial evidence to defeat summary judgment. However, Plaintiff has not presented evidence that fits into the categories

described in the first and second types of circumstantial evidence, and does not pursue an argument for the third type.

a. Bits and pieces from which an inference of discriminatory intent may be drawn

As for the first type of circumstantial evidence, Plaintiff argues that Defendants' actions in the aerator incident and the overtime incident (including both the computation of overtime as well as the absence from the meeting to discuss overtime calculations) indicate that "there exists sufficient suspicious conduct and other 'bits and pieces from which an inference of discriminatory intent might be drawn' in this case therefore creating a material issue of fact as to whether race was a factor in the decision by Roth to discharge Rodgers in 2006." Memorandum in Opposition to Motion for Summary Judgment, p.10 (#38). However, Plaintiff does not point to any suspicious timing of events, ambiguous statements made by Roth or Fitts, or behavior toward or comments directed at other employees in the protected group. Cf. Darchak v. City of Chicago Bd. of Educ., 580 F.3d 622, 631-33 (7th Cir. 2009) (finding sufficient circumstantial evidence existed to defeat summary judgment when a plaintiff proffered evidence of, among other things, a supervisor who made racially derogatory remarks and a suspiciously timed failure to renew the plaintiff's employment contract). Therefore, Plaintiff cannot sustain an argument under the first type of circumstantial evidence.

b. Similarly situated employees received systematically better treatment

In the second class of circumstantial evidence, Plaintiff must show that there is a genuine issue of material fact that similarly situated employees outside the protected class received

*systematically* better treatment. Pattern evidence consists of quantitative data providing some probative value regarding the systematic application of discriminatory employment practices over a period of time. See, e.g., Sun v. Bd. of Trs. of Univ. of Ill., 473 F.3d 799, 812-13 (7th Cir. 2007); Nichols v. S. Ill. Univ.-Edwardsville, 510 F.3d 772, 782 (7th Cir. 2007). Plaintiff has not offered any evidence of this sort. Because Plaintiff has not provided any evidence of race-motivated discrimination that qualifies under the direct method, this court must proceed to analyze the claim under the indirect method.

B. Indirect method

Given the difficulty of proving discriminatory intent via the direct method, the courts have indicated that a plaintiff may indirectly prove race discrimination by demonstrating disparate treatment and using the burden-shifting method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the burden-shifting method, a plaintiff must first make a *prima facie* case by establishing that: (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) he experienced an adverse employment action; and (4) similarly situated individuals of a different race were treated more favorably. Traylor v. Brown, 295 F.3d 783, 788 (7th Cir. 2002). If the plaintiff does so, he creates a presumption of discrimination. The burden of production then shifts to the defendant to present a legitimate, nondiscriminatory, and non-invidious reason for the adverse employment decision. Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 540 (7th Cir. 1998); Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 644 (7th Cir. 2002). If the employer provides such a reason, the burden shifts back to the plaintiff, who must then show that the employer's proffered

reason was only a pretext for discrimination. Crim, 147 F.3d at 540. That is, the plaintiff must show that "race more likely motivated the employer." Cowan v. Glenbrook Sec. Svcs., Inc., 123 F.3d 438, 445 (7th Cir. 1997). Once the plaintiff shows the employer's reason is pretextual, he "need not also come forward with further evidence of intentional discrimination to survive summary judgment. His proof would at that point be sufficient to support an inference that the company's real reason was discriminatory." Hoffman v. MCA, Inc., 144, F.3d 1117, 1123 (7th Cir. 1998) (editing marks omitted). See also Weisbrot v. Med. Coll. of Wis., 79 F.3d 677, 682 (7th Cir. 1996) (holding that in the pretext phase of a motion for summary judgment, an employee need only produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for his dismissal).

Critically, "the plaintiff must meet each prong of the prima facie test before reaching pretext[;]" Herron v. DaimlerChrysler Corp., 388 F.3d 293, 300 (7th Cir. 2004), it would not do, in the words of the Seventh Circuit, to "put the pretext cart before the prima facie horse." Brummett v. Lee Enters., Inc., 284 F.3d 742, 744 (7th Cir. 2002). Accordingly, this analysis begins with the *prima facie* case.

1. Prima facie case

Because the four elements of the *prima facie* case are joined with the conjunctive "and", and not the disjunctive "or", and because the plaintiff must prove a valid *prima facie* case before shifting the burden to the defendants, the failure to satisfy any one of the elements necessarily results in the failure to defeat a motion for summary judgment under the indirect method. Because a decision on any one element is therefore dispositive to the motion, this court declines

to address the first three elements, and proceeds to determine whether Plaintiff has satisfied the fourth element.

2. Similarly situated analysis

To be considered "similarly situated", an employee must be "directly comparable in all material respects." Sartor v. Spherion Corp., 388 F.3d 275, 279 (7th Cir. 2004). "[A] plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000). Therefore, for two employees to be similarly situated at the time of comparison, they must have (1) reported to the same supervisor; (2) engaged in the same or similar conduct; (3) had the same qualifications; (4) been subjected to the same standards; and (5) not had differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. Radue, 219 F.3d at 617-18; Ineichen v. Ameritech, 410 F.3d 956, 960-61 (7th Cir. 2005). More precisely, for a terminated plaintiff to show he was similarly situated to another employee, the plaintiff must show that the other coworker had a "comparable set of failings." Burks v. Wis. Dept. of Transp., 464 F.3d 744, 751 (7th Cir. 2006).[3] However, while the analysis must be peculiar to the facts of each case, the degree of similarity is not so narrow as to demand that the same events occurred to

---

[3]See also Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 916 (7th Cir. 2010) (holding that two employees were similarly situated when the plaintiff used profanity and her co-worker failed to respond to a call light); Goodwin v. Bd. of Trs. of the Univ. of Ill., 442 F.3d 611, 619 (7th Cir. 2006) (holding that a black female plaintiff who had displayed vulgar email on her computer and made an involuntary exclamation, thereby drawing the attention of surrounding co-workers, was similarly situated to a white male co-worker who threw a bottle cap at a female foreman and told her to "shove it up her ass" because both were "vulgar and potentially threatening"); cf. Jones v. Union Pacific R. Co., 302 F.3d 735, 745 (7th Cir. 2002) (holding that two coworkers are not similarly situated if one was terminated for insubordination and the other for being involved in an altercation with another employee at work).

both individuals. E.g. Goodwin v. Bd. of Trs. of the Univ. of Ill., 442 F.3d 611, 619 (7th Cir. 2006).

In this case, Fitts's request for termination provided, for the aerator incident, that Plaintiff (1) failed to properly supervise his subordinate employees, which resulted in equipment being used for personal business; (2) failed to cooperate with the investigators by making statements which were refuted by other employees; and (3) permitted widespread abuse of State property. For the overtime incident, Fitts's request provided that Plaintiff (1) failed to properly report and record overtime being earned by subordinate employees; (2) willfully ignored a directive to report overtime in a management-approved fashion; (3) failed to notify his subordinates about a meeting; and (4) failed to attend the meeting. The two incidents are so substantially dissimilar that they cannot be considered a single episode. While both incidents involved an alleged failure to follow protocol, the aerator incident also involved an alleged failure to supervise, whereas the overtime incident also involved alleged insubordination. Therefore, Defendants gave two separate and independent reasons to justify Plaintiff's discharge, rather than two episodes with one material cause.[4] Cf. Goodwin, 442 F.3d at 619.

Plaintiff argues that there were similarly situated white co-workers who were treated differently than the plaintiff. For the aerator incident, Plaintiff claimed that Perce and Greeley were similarly situated. For the overtime incident, Plaintiff claimed that Rusciolelli and Deffenbaugh were similarly situated. Plaintiff has not, however, claimed that there is an individual who is similarly situated regarding both reasons for the termination. Clearly, an

---

[4]If Plaintiff had argued and demonstrated that each reason was, independently, a necessary and sufficient terminable offense, he might have been able to argue that the two reasons provided in Fitts's recommendation and request were logically separable and, in doing so, fairly provided one comparator for each reason. But that is not the case.

employee who was discharged for two reasons has "differentiating . . . circumstances as would distinguish . . . the employer's treatment" of another employee who engaged in conduct similar to Plaintiff's conduct for only one of the reasons, and was not discharged. Radue, 219 F.3d at 618. Under the unique circumstances present in this case, this court concludes that Plaintiff has not shown that similarly situated individuals of a different race were treated more favorably. Therefore, Plaintiff cannot successfully oppose the motion for summary judgment via the indirect method. Furthermore, Plaintiff has provided no evidence of race discrimination via the direct method. Accordingly, Defendants' Motion for Summary Judgment must be granted.

    IT IS THEREFORE ORDERED THAT:

(1) Defendants' Motion for Summary Judgment (#33) is GRANTED.

(2) This case is terminated.

ENTERED this 23rd day of November, 2010

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE